RENDERED: FEBRUARY 24, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0512-MR

ANITA KELLY, PERSONAL
REPRESENTATIVE OF THE ESTATE
OF MAE LOUISE COPLEY                                             APPELLANT


                        APPEAL FROM LAWRENCE CIRCUIT COURT
v.                      HONORABLE JOHN DAVID PRESTON, JUDGE
                        ACTION NO. 19-CI-00296


MAGNUM DRILLING OF OHIO,
INC.; JAMES H. LARGE; AND
THOMAS CRISP                                                     APPELLEES


OPINION
VACATING AND REMANDING

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; EASTON AND TAYLOR, JUDGES.

EASTON, JUDGE: Anita Kelly, the personal representative of the estate of Mae

Louise Copley (Copley), appeals from an order of the Lawrence Circuit Court

which granted summary judgment in favor of Magnum Drilling of Ohio, Inc.[1] (Magnum), Thomas Crisp, and James H. Large, on all claims alleged against them. We vacate and remand because the circuit court's ruling regarding at least one issue of contract interpretation resulted in a premature finding of fact.

**FACTUAL AND PROCEDURAL BACKGROUND**

In May 1994, Large and Crisp, together with their wives, purchased more than 250 acres in Lawrence County, Kentucky.[2] Large and Crisp are co-owners of Magnum. At some point, Magnum began drilling operations for the removal of oil and gas from the Large and Crisp property. However, Magnum's unapproved use of a roadway located on the property of their neighbor Raymond Starr resulted in litigation which ultimately led to our Court determining in 2005 that neither Magnum nor the general public had acquired any right of way over Starr's property.

Copley owned and lived on a 54-acre property in Lawrence County which bordered the property owned by Large and Crisp. After being approached

---

[1] According to deposition testimony, the name of a successor to Magnum Drilling of Ohio, Inc., is now Magnum Drilling, Inc. We will refer to the current corporation as Magnum.

[2] These facts are taken from the unpublished Court of Appeals opinion in No. 2003-CA-002774-MR. *Starr v. Magnum Drilling of Ohio, Inc.*, No. 2003-CA-002774-MR, 2005 WL 678582 (Ky. App. Mar. 25, 2005).

by Magnum, Copley signed an Oil and Gas Lease (the Lease) with Magnum on October 3, 2013.

According to Copley, but unbeknownst to her at the time of the signing of the Lease, Magnum, Large, and Crisp only sought a lease for Copley's land because they had found their prior operations effectively "landlocked" after losing access over Starr's property. Copley alleged she had been fraudulently promised lucrative payouts for the extraction of oil and gas from her property, but Magnum and its officers only wanted her land to conduct extensive operations on her property to remove oil and gas from neighboring properties Magnum already owned or leased; operations which greatly and adversely affected her property but provided her with little remuneration. The relevant terms of the Lease will be analyzed later in our analysis of its language and the parties' positions thereon.

After securing the Lease, Magnum "unitized" its Lease for Copley's property together with the neighboring properties it also leased or owned. Unitization refers to combining separately owned mineral or leasehold interests related to a common supply such as a reservoir or field to create a joint operation to maximize production and optimize operations. Unitization generally involves a larger area and is undertaken for purposes of resource conservation. Magnum alleges Copley's property "could not have been developed without unitization"

because extraction operations solely on Copley's property would not be financially viable since she only had 54 acres.

Magnum placed four horizontal wells for this unitized operation. A horizontal well, as opposed to a vertical well, is initially drilled straight down but then turns in a horizontal direction for several thousand feet to fully extract oil and gas all along its entire length. Three wellheads (where the oil or gas comes out of the ground) are located on Copley's property. The fourth wellhead is on neighboring property. Regardless of the physical location of the wellheads, the wells to which they are attached gather oil and gas all along their length. Therefore, the three wellheads located on Copley's property produce oil and gas from deposits located not only below Copley's property but also from deposits located below neighboring properties.

On November 22, 2019, Copley filed suit against Magnum, Large, and Crisp. She alleged four causes of action: (1) Property damage; (2) Piercing Magnum's corporate veil to cause personal liability of Large and Crisp; (3) Fraud in the inducement; and (4) Per the language of the contract, she should be paid for 1/8 of all oil and gas coming out of the wells which Magnum placed on her property, not just 1/8 of the oil and gas coming from deposits located on her property. Following discovery, Magnum moved for summary judgment on all

counts and Copley moved for partial summary judgment relative to her contract claim.

The circuit court denied Copley's motion and granted summary judgment to Magnum dismissing all of Copley's claims on April 1, 2021.

The circuit court's order sets forth its analysis and reasoning:

> The Plaintiff [Copley] has filed a motion for partial summary judgment and in the motion asks the Court to order that the Defendants pay to the Plaintiff an amount equal to a one-eighth part of the oil produced from the wells located on the property of the Plaintiff, even though some of the production comes from property owned by other individuals.

> In their motion, the Defendants state that the Plaintiff executed and delivered an oil and gas lease on October 13, 2003, to Defendant Magnum Drilling of Ohio, Inc. The terms and conditions of the lease allow the unitization of the Plaintiff's property with adjoining properties. The Defendants state that the Copley property could not be developed without unitization with other properties, since it contained only fifty-four acres. The wellhead on three of the four wells was located on the Plaintiff's property. A fourth wellhead was located on adjoining property, but the Plaintiff shares in the royalties since part of the lateral line is on her property. The Defendant attached a list of property owners for the various wells, showing six owners for well 6-H, three owners for well 7-H, three owners for well 8-H, and three owners for well 9-H. From the record, it appears that all of the owners share in the production from the wells to the extent of their ownership with surface in the areas surrounding the wells.

> Under the facts and circumstances of this case, it is apparent to the Court that the Plaintiff is being properly

paid for her royalties, since the lease involved in this case was unitized, and royalties were being paid to the surface owners in proportion to the ownership of land within the area of each well. Accordingly, the Defendants are entitled to summary judgment on the claim of the Plaintiff for royalties.

Having found in favor of the Defendants on the issue of unitization of the wells, it is unnecessary for the Court to reach the remaining issues raised by the Defendants in their motion for summary judgment.

Copley filed a motion to alter, amend, or vacate. The circuit court denied Copley's motion with the exception it noted the correct date of the Lease was October 3, 2013. Copley passed away on August 16, 2021, and since then this appeal has been prosecuted by her estate's representative. For the sake of clarity, we will still refer to the appellant in this Opinion as "Copley."

## STANDARD OF REVIEW

On appeal, the standard of review for a summary judgment is to ascertain whether the trial court correctly determined that no genuine issue of material fact existed, entitling the moving party to judgment as a matter of law. *Coomer v. CSX Transp., Inc.*, 319 S.W.3d 366, 370-71 (Ky. 2010). Because summary judgment involves only questions of law and not the resolution of disputed material facts, an appellate court does not defer to the circuit court's decision. *Goldsmith v. Allied Building Components, Inc.*, 833 S.W.2d 378 (Ky. 1992).

-6-

## ANALYSIS

As an initial matter we must address the fact that, as Magnum correctly argues, Copley did not include a statement in her argument showing where and in what manner each issue was preserved for review. Kentucky Rule of Appellate Procedure (RAP) 32(A)(4).[3] "It goes without saying that errors to be considered for appellate review must be precisely preserved and identified in the lower court." *Skaggs v. Assad, ex rel. Assad*, 712 S.W.2d 947, 950 (Ky. 1986). "The decision as to how to proceed in imposing such penalties is a matter committed to our discretion." *Roberts v. Bucci*, 218 S.W.3d 395, 396 (Ky. App. 2007). While this Court could impose sanctions on Copley to include striking her brief for such an elemental failure to comply with RAP 32(A), because this case involves rather narrow issues of law about both contractual construction and summary judgment, we elect to look past these failures and to proceed without sanctions. We do so trusting counsel will comply with the mandates of RAP 32(A) in all future appeals.

Copley argues on appeal the clear language of the Lease provides for her to receive royalties equating to 1/8 of the value of all oil and gas taken from "wells" which are situated on her property. In support, she correctly notes that only "wells" are named in the payment terms of the Lease, and she thus contends

---

[3] Former Kentucky Rule of Civil Procedure (CR) 76.12(4)(c)(v).

the term "wells" should include wellheads, lateral wells, and vertical wells since they are not distinguished one from another. Furthermore, she argues that to the extent there is any ambiguity in the Lease's language, such ambiguities should be construed against Magnum, the drafter.[4]

Magnum in turn argues the Lease is clear that Magnum could unitize Copley's property and that if she were to be paid 1/8th of all oil coming from wellheads located on her property, that she would be paid not only for the oil produced from deposits on her property, but also oil produced by the lateral wells from deposits below her neighbors' property as well.

We review the circuit court's interpretation of a contract, including determining whether a contract is ambiguous, as questions of law to be determined *de novo*. *Abney v. Nationwide Mutual Insurance Company*, 215 S.W.3d 699, 703 (Ky. 2006); *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694-95 (Ky. 2016).

Our review of the Lease requires analysis of not only the language of the payment terms but the whole of the contract. Moreover, in the absence of ambiguity, a written instrument will be enforced strictly according to its terms "and a court will interpret the contract's terms by assigning language its ordinary

---

[4] The doctrine of "*contra proferentem*: When interpreting contracts susceptible to two meanings, we construe ambiguity against the drafter[.]" *Majestic Oaks Homeowners Association, Inc. v. Majestic Oaks Farms, Inc.*, 530 S.W.3d 435, 441 (Ky. 2017).

meaning and without resort to extrinsic evidence." *Wehr Constructors, Inc. v. Assurance Company of America*, 384 S.W.3d 680, 687 (Ky. 2012) (quoting *Frear v. P.T.A. Industries, Inc.*, 103 S.W.3d 99, 106 (Ky. 2003)).

When attempting to discern ambiguities as alleged by Copley, our standard is that "[a] contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Hazard Coal Corporation v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010) (citation omitted).

If the language is ambiguous, the court's primary objective is to effectuate the intentions of the parties. *Cantrell Supply, Inc. v. Liberty Mutual Insurance Company*, 94 S.W.3d 381, 384 (Ky. App. 2002). "The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms." *Abney*, 215 S.W.3d at 703 (quoting *Cantrell*, 94 S.W.3d at 385).

The Lease provided for Copley to be compensated as follows:

4. In consideration of premises, the Lessee covenants and agrees:

(a) to pay, as royalty, free of cost, the equal of one-eighth (1/8) part of all oil produced and saved and sold from the premises;

(b) to pay to the Lessor, as royalty, for the gas marketed and used off the premises and produced from each well drilled thereon, the sum of one-eighth (1/8) of the wellhead price paid to Lessee per thousand cubic feet of such gas so marketed and used. Payments of royalties

-9-

for gas marketed during any calendar month shall be paid on or about the 30th day of the following month.

Copley argues that the language "each well drilled thereon" must mean, or include, each wellhead found on the surface of her property. While the Lease certainly could have been more clear and distinguished wellheads, lateral wells, and horizontal wells, we cannot agree to apply or expand definitions which would either be at odds with common industry usage or would lead to an inappropriate outcome.

The wellheads located on the surface of Copley's land were connected to piping running laterally for thousands of feet under neighboring property and drew oil and gas along their entire length. In the context of a unitized operation, and unless clearly established otherwise in the contract, Copley could not expect to be paid royalties for oil and gas which had been drawn from deposits below her neighbors' property merely because they exited the surface on her property. Such an outcome would also be contrary to the unitizations where "participation" in the unit is typically proportionate to the oil and gas reserves being contributed to the unit by each of the entities. To read the Lease as Copley argues would expand her royalties well beyond payment for the oil and gas taken "from [her] premises" which would be contrary to the contractual language.

However, while the circuit court correctly noted that "[t]he terms and conditions of the Lease allow the unitization of the Plaintiff's property with

-10-

adjoining properties[,]" the Lease only does so with a particularity not addressed by the circuit court.  The circuit court was correct that unitization is prevalent and common in oil and gas extraction, but we must look to the actual language of the contract.  The Lease explicitly states:

> 7.  Lessor further grants to the Lessee, its successors and assign, *the right to unitize this lease with other leases* to form a drilling unit or units for the proper development and conservation of the field.  *However, it is understood and agreed by the parties that his lease will be unitized only if necessary to conform to applicable governmental statutes and/r [sic] regulations.*

(Emphasis added.)

When the circuit court wrote "[t]he Defendants state that the Copley property could not be developed without unitization with other properties, since it contained only fifty-four acres[,]" it was accepting a mere allegation made by Magnum that appears to be more of a profitability argument rather than a legal mandate.  Magnum itself argued that "the spacing requirements of KRS[5] 353.645 would have mandated unitization on this property" but the circuit court did not conclude that this was true, and we are without sufficient information to draw such legal conclusion ourselves.

We recognize oil and gas well spacing requirements established in KRS Chapter 353 were designed to protect the correlative rights of adjoining

---

[5] Kentucky Revised Statutes.

-11-

property owners. *See* KRS 353.510, KRS 353.610, 805 KAR[6] 1:100 section 1-3, and 805 KAR 1:130. However, if this is a situation where a well (including all subterranean components) could have been placed anywhere on Copley's property that complied with the spacing requirements of KRS Chapter 353 at the time it was drilled, then all the oil and gas produced from that well would have belonged to Magnum per the Lease and been subject to royalties being owed to Copley, even if the well drew in oil and gas that had been situated in a larger field that also ran under neighboring property.

This is so because in Kentucky the ownership of oil and gas is established by what is known as the "Law of Capture," which recognizes the *mineral ferae naturae* of oil and gas. Oil and gas, unlike other minerals, but akin to animals, have a power and a tendency to escape without the intervention of a purported owner. Oil and gas belong to the owner of the land and are part of it, so long as they are on or in it, and are subject to his control; but when they escape and go to other land, or come under another's control, the title to the former owner is gone. *See Texas American Energy Corp. v. Citizens Fidelity Bank & Tr. Co.*, 736 S.W.2d 25, 26 (Ky. 1987).

In sum, the circuit court made no analysis as to whether Magnum, after acquiring the Lease, found itself compelled by any statute or regulation to

---

[6] Kentucky Administrative Regulations.

-12-

unitize the Copley Lease with neighboring properties.  Likewise, the record discloses no licensing applications, permit applications,[7] proposals, or notifications submitted by Magnum to any governmental entity or any interactions whatsoever between Magnum and the state regarding Magnum's desire to, or legal need to, unitize its Copley leasehold with neighboring property.

In the case before us, there is nothing in the contract considered in separate paragraphs or from the Lease as a whole from which it may be inferred that the words "only if necessary" were intended to mean that Magnum had unlimited discretion to decide to unitize the Copley ease or that it had informed Copley that her lease would be unitized prior to her entering the Lease.  There is nothing here to show what, or any, contrary construction was placed on the contract before us by the parties at the time it was executed.

Such analysis and information are necessary to abide by the terms of the contract which allows Magnum to unitize the lease "***only if*** *necessary to conform to applicable governmental statutes and/or regulations*."  (Emphasis added.)  To read the lease in such a way as to allow Magnum to determine for subjective economic reasons, instead of statutory or regulatory mandates, to unitize Copley's lease would invite an ambiguity which does not appear from the plain

---

[7] For instance, KRS 353.645:  Operation and development as a unit of oil and gas interests in a pool or pools; application for unit; hearing; unitization order; review under KRS 353.700.

reading of the lease. "A basic rule of contract interpretation requires that preference be given to the 'interpretation which gives a reasonable, lawful, and effective meaning to all the terms' over a reading 'which leaves a part unreasonable, unlawful, or of no effect.'" *Maze v. Bd. of Directors for Commonwealth Postsecondary Education Prepaid Tuition Tr. Fund*, 559 S.W.3d 354, 363 (Ky. 2018) (quoting *Comstock & Co., Inc. v. Becon Const. Co.*, 932 F.Supp. 948, 967 (E.D. Ky. 1994)).

We need not address that part of the circuit court's order which dismissed all of Copley's other causes of action by stating that "[h]aving found in favor of the Defendants on the issue of unitization of the wells, it is unnecessary for the Court to reach the remaining issues raised by the Defendants in their motion for summary judgment." It is clear Copley elected to proceed only on the contractual claim in this appeal rather than facing the election later of proceeding on the claim of fraud in the inducement as opposed to seeking contractual damages. *Hampton v. Suter*, 330 S.W.2d 402, 406 (Ky. 1959).

Copley's prehearing statement does not substantively address the claims other than contractual damages,[8] and Copley did not argue the other claims in her briefs. Given this lack of argument, we view the other claims as waived and

---

[8] A claim not addressed in the prehearing statement is waived. RAP 22(C)(2), formerly CR 76.03(8).

not requiring any further comment. *See Commonwealth v. Pollini*, 437 S.W.3d 144, 148 (Ky. 2014). We note Copley's veil piercing claim could not be determined until and unless liability was found against Magnum. Further discussion on that claim is premature.

**CONCLUSION**

Accordingly, we vacate the order granting summary judgment and remand to the Lawrence Circuit Court for further proceedings consistent with this Opinion.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Larry D. Brown
Prestonsburg, Kentucky

BRIEF FOR APPELLEES:

Eldred E. Adams, Jr.
Louisa, Kentucky